Mark Mausert
NV Bar No. 2398
Sean McDowell, Esq.
NV Bar No. 15962
729 Evans Avenue
Reno, NV 89512
(775) 786-5477
Fax (775) 786-9658
mark@markmausertlaw.com
sean@markmausertlaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| REBECCA CARTWRIGHT<br><br>Plaintiff, vs.<br><br>VERANO NEVADA, LLC d.b.a. SIERRA WELL,<br><br>Defendant | Case No.:<br><br>**COMPLAINT AND JURY DEMAND** |

COMES NOW plaintiff, through counsel, and hereby complains of defendant Verano Nevada, LLC d.b.a. Sierra Well, (hereinafter "defendant"), via this Complaint and Jury Demand as follows:

Jurisdiction, Venue & Jury Demand

1. Plaintiff is a woman and is a resident of northern Nevada. All, or almost all, acts, statements, communications, and omissions alleged herein occurred in northern Nevada, i.e., in or about Reno, Nevada. Plaintiff hereby requests a jury trial relative to all issues so triable. Plaintiff has obtained a Notice of Right to Sue from the Equal Employment Opportunity Commission, dated July 19, 2022, i.e., plaintiff has exhausted administrative remedies in accord with federal law. This Complaint and Jury Demand is timely filed in accordance with the Notice of Right to Sue which accompanies this Complaint and Jury Demand and is incorporated herein.

COMPLAINT AND JURY DEMAND - 1

2. Defendant is a limited liability company, corporation, partnership, or some other legal entity which employed plaintiff from approximately June 9, 2017, until August 2, 2021, at which time plaintiff's employment was terminated by defendant. Defendant became liable for the causes of action herein when it became plaintiff's employer on or about July 26, 2021, when defendant signed a merger agreement with Sierra Well. In the alternative, defendant is liable for Sierra Well's unlawful conduct as the successor in interest to Sierra Well per the merger agreement. At all relevant times defendant, as successor in interest to Sierra Well, employed at least fifty employees within a 75-mile radius of plaintiff's worksite for at least twenty weeks per year. Defendant maintains a business operation in Reno, Nevada, where plaintiff was previously employed.

3. This Court has venue over this action because all, or almost all, acts communications, statements, and omissions alleged herein occurred in northern Nevada; defendant does substantial business in northern Nevada, e.g., it maintains a place of business in Reno, Nevada, at which all, or almost all, acts, statements, and omission which form the basis for this lawsuit occurred. Therefore, this Court has venue pursuant to 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 2601 et. seq.

4. This Court has jurisdiction over this matter as plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, i.e., 42 U.S.C. § 2000e, et. seq., and under the Family and Medical Leave Act of 1993, i.e., 29 U.S.C. § 2601, et. seq. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. 1343. Jurisdiction exists because plaintiff is a woman who alleges she was subject to gender/sex-based harassment and/or pregnancy discrimination, and was terminated in violation of Title VII and/or the Family and Medical Leave Act. Plaintiff alleges she was harassed "because of sex", as defined by Title 42 and that she was subject to retaliation in violation of Title VII and the Family and Medical Leave Act, i.e., termination of her employment in response to requesting time off after plaintiff suffered a miscarriage.

///

COMPLAINT AND JURY DEMAND - 2

First Cause of Action

(Harassment/Hostile Work Environment Based on Sex)

5. Plaintiff hereby incorporates the allegations of paragraphs 1 through 4, inclusive, as well as all other paragraphs herein, as though the same were fully stated.

6. Plaintiff was employed by defendant from approximately June 9, 2017, until August 2, 2021. Plaintiff was employed in a managerial/supervisory position; however, plaintiff was not delegated authority to reprimand employees for misconduct. Throughout much, or in most instances, all of plaintiff's tenure, plaintiff was subjected to sexual and/or gender harassment "because of sex", as prohibited by 42 U.S.C. § 2000e, et. seq. Plaintiff's work environment was rendered hostile and offensive primarily by repeated and prolonged exposure to sexually foul and abusive music, i.e., "hiphop" or "rap" music. Defendant permitted a number of its employees and upper-level managers to play this music routinely and loudly in its work environment. Plaintiff's manager Todd Wold would regularly play this music and loudly sing along with the most graphic lyrics in the song. The subject work environment is a small, enclosed room i.e., totaling approximately 1,000 square feet. With the normal daily background noise, music played from a small speaker could be easily heard. Defendant allowed a large Sony GTK high-powered speaker to be used in the work environment. Managers and employees would connect to this speaker using "Bluetooth" to stream music from commercial sources. The music of which plaintiff and other female employees complained did not customarily, or ever, emanate from radio stations regulated by the Federal Communications Commission (FCC). The offensive music could be heard through much of the workplace.

7. The rap music was loudly played, i.e., the obscene lyrics could easily be heard. The music sent an implicit and clear message to defendant's employees, to wit, the written policies which defendant had disseminated were pro forma, i.e., they were for show only and would not be enforced. This message applied to just about every personnel policy, i.e., defendant's employees were implicitly conveyed the message the work environment was wide open for any

COMPLAINT AND JURY DEMAND - 3

and every sort of misconduct, including sexual harassment. Songs containing obscene, sexually abusive, sexually graphic, and openly misogynistic and violent conduct – directed towards women were routinely, loudly, openly, and frequently played in plaintiff's work environment. Pejorative remarks and name-calling, directed at women, were made by defendant's employees, managers, and via the offensive music, e.g., women were referred to as "b___s", "hoes" (i.e., "whores"), and "c___ts". In addition to allowing the foul, sexual, violent, and misogynistic songs to be routinely and loudly played throughout its facility, defendant allowed various male employees, and managers, to sing along and to accompany their singing with various sexual gestures, e.g., pantomiming sexual intercourse, grabbing their clothed genitals while looking at women employees, etc. In short, in addition to repeatedly and forcefully repudiating the written policy which defendant purportedly maintained in place, and which it promised it would enforce. The act, or omission, of allowing violently misogynistic and graphically sexually abusive material to be loudly and regularly broadcast throughout its facility actively successfully encouraged other acts and statements of a sexually abusive and/or misogynistic character. By allowing obscene rap music to be routinely and frequently broadcast, defendant guaranteed its work environment would be offensive "because of sex", especially re the average hypothetical reasonable woman, and relative to most of its women employees. Plaintiff herself, and other female employees were offended by the music and by various sexually based statements and actions of her co-employees and managers, as they often performed in sync with or in conjunction with the music.

8.  Defendant received notice on a daily, or almost daily basis, of the fact misogynistic and/or sexually offensive music was being openly played in its work environment. Defendant received such notice by virtue of the music itself. That is, on a regular basis, defendant had a number of managers present in the subject workplace, and those managers, including high-level managers, could hear the lyrics of the music, or would play the music themselves. That is, defendant's managers knew, and had to have known, songs with obscene and otherwise very

sexually offensive and misogynistic lyrics were being loudly and frequently broadcast in defendant's work environment. Furthermore, defendant received complaints from plaintiff nearly every time the music was played to the effect the music was offensive "because of sex", i.e., because of the obscene and sexually offensive and misogynistic character of the music. These complaints were ignored by defendant, and defendant failed to take meaningful and consistent action to halt the music, and otherwise fulfill its promise of a work environment free of sexual hostility. Part and parcel of the hostility plaintiff experiences was defendant's repeated and protracted refusal to investigate and remedy the playing of rap music in its work environment. For instance, notwithstanding its managers having fielded many complaints by plaintiff and other female employees as to the misogynistic and sexually offensive character of the music, defendant trivialized those complaints, and the foreseeable effect of playing such music. Defendant failed to timely investigate, even though plaintiff and other female employees complained of the prevalence of the foul rap music and various other forms of sexual harassment.

9. Defendant further allowed a sexually-hostile work environment to exist alongside the music. Employees were required to change into their work coveralls on site to ensure a sterile work environment. The room in which employees were required to change in was not private, i.e., it was a single room, which was monitored by video surveillance, and served the dual purpose of being the reception area of the building. Non-employees would regularly come into the building while employees were changing and be able to see the employees in various states of undress. Defendant required employees to be changed and at their workstations within a short amount of time. This time constraint meant that men and women were required to change at the same time. Furthermore, when plaintiff along with other female employees complained about the changing room situation and requested their own changing room, defendant told the women to use a small, single person bathroom. This was not a reasonable accommodation because the women could not change at the same time in the bathroom, which would cause them to be late arriving to their workstations.

10. While changing, sexual comments and conduct were a constant occurrence. One example being where one of plaintiff's coworkers, Michael Thorton, would take his clothes off down to his underwear and stand so close to plaintiff that his stomach would be pressed against her back. When Plaintiff complained to the cultivation manager at the time, Jake O'Rourke, he refused to take any remedial action because he did not witness the conduct firsthand.

11. As a Direct and proximate result of being subject to a sexually hostile work environment, plaintiff suffered emotional distress, loss of enjoyment of life, fear, anger, humiliation, loss of sleep, and anxiety. It has been necessary for plaintiff to incur costs and retain counsel to attempt to vindicate her right to a workplace free from sexual hostility, gender-based hostility, and retaliatory hostility.

<u>Second Cause of Action</u>

(Sex/Pregnancy Discrimination)

12. Plaintiff hereby incorporates the allegations of paragraphs 1 through 11, inclusive, as well as all other paragraphs herein, as though the same were fully stated.

13. In March of 2021, plaintiff discovered she was pregnant with her first child. On June 25th, 2021, plaintiff's pregnancy became high risk. On the evening of July 7th, after informing manger Todd Wold that her baby did not have a heartbeat and the doctors were going to induce labor, plaintiff was placed on medication to induce labor. On July 8th, plaintiff's daughter was delivered stillborn. On July 8th, plaintiff was granted time off of work due to her suffering a miscarriage, and was told by manager Todd Wold to complete some documents so she could take extra time off. On July 9th, plaintiff emailed defendant's HR department asking for information or for paperwork to take leave from work to recover emotionally from the miscarriage of her daughter as directed by Mr. Wold. Plaintiff received no response from HR and was provided with no documents for her leave.

14. Between July 9th, and July 21st, plaintiff's significant other, Matthew Robinson, who was

also employed by defendant, maintained regular contact with defendant regarding plaintiff's recovery from the miscarriage and continued time off. On July 21st, plaintiff received an email from defendant asking when plaintiff was planning on returning to work. On July 30th, Mr. Robinson informed defendant that he and plaintiff had just picked up their daughter's ashes and were not ready to return to work. The following day on July 31st, plaintiff received an email from defendant stating that because plaintiff and Mr. Robinson had failed to maintain contact with defendant, it would consider their resignation effective August 2nd, 2021, if they did not respond to defendant with their intentions. On August 2nd, at approximately 3:00 in the afternoon, Mr. Robinson emailed defendant's CEO at the time, Michael Livak, explaining that plaintiff and he were not resigning, that plaintiff was still in an incredibly fragile emotional state and would require further time off.  Approximately 30 minutes later, Mr. Livak emailed Mr. Robinson that he and plaintiff were being terminated for job abandonment.

15. During plaintiff's tenure with defendant, she had received a single verbal write-up. Plaintiff was later demoted from a managerial to a supervisory position after making a regulatory compliance mistake. Plaintiff was performing satisfactorily enough that she retained her managers salary.

16. In 2017, Andrew Koetting, who was an upper-level manager at the time was given 3 to 4 months off for the birth of his child.

17. Accordingly, defendant engaged in conduct prohibited by 42 U.S.C. § 2000e, et. seq. when it chose to terminate a woman who had just suffered a miscarriage, who's work performance was satisfactory at the time of termination, and a similarly situated male employee was allowed to take 3 to 4 months off of work after the birth of his child.

18. As a Direct and proximate result of being subject to discrimination based on pregnancy, plaintiff suffered emotional distress, loss of enjoyment of life, fear, anger, humiliation, loss of sleep, and anxiety. It has been necessary for plaintiff to incur costs and retain counsel to attempt to vindicate her right to a workplace free from sex/pregnancy discrimination, and retaliatory

hostility.

### Third Cause of Action

### (Family and Medical Leave Act ("FMLA") Interference)

19. Plaintiff hereby incorporates the allegations of paragraphs 1 through 18, inclusive, as well as all other paragraphs herein, as though the same were fully stated.

20. Defendant employs more than 50 employees within a 75-mile radius of plaintiff's worksite.

21. Plaintiff worked for defendant for more than 1 year.

22. On July 8th, 2021, plaintiff notified defendant that she was about to undergo induced labor to deliver her daughter who no longer had a heartbeat and would require an extended leave of absence.

23. On July 9th, 2021, plaintiff requested defendant provide to her any documentation as may be necessary to take an extended leave of absence due to severe emotional trauma caused by the miscarriage of her daughter.

24. Defendant failed to provide plaintiff with any paperwork, and ultimately denied her benefits for which she was entitled under the Family and Medical Leave Act when defendant terminated plaintiff's employment after only 3 weeks and 3 days from the time plaintiff requested defendant supply her with documents for an extended leave of absence.

25. Accordingly, defendant engaged in conduct prohibited by 29 U.S.C. § 2601 et. seq. when it failed to provide to plaintiff FMLA benefits for which she was entitled, and instead terminated her employment.

26. As a Direct and proximate result of defendant's interference with plaintiff's FMLA benefits, plaintiff suffered emotional distress, loss of enjoyment of life, fear, anger, humiliation, loss of sleep, anxiety, and economic damages. It has been necessary for plaintiff to incur costs and retain counsel to attempt to vindicate her right to benefits for which she was entitled per 29 U.S.C. § 2601 et. seq.

WHEREFORE, plaintiff requests the following relief:

1. For an award of compensatory damages;
2. For an award of punitive damages sufficient to punish and deter defendant from engaging in similar conduct;
3. For an award of special or actual economic damages according to proof;
4. For an award of costs and reasonable attorney's fees;
5. For injunctive relief to compel defendant to adopt and actually enforce a reasonably policy against sexual harassment and/or discrimination;
6. For injunctive relief to compel defendant to adopt and actually enforce a policy that is in compliance with 29 U.S.C. § 2601 et. seq.; and
7. For any further relief the Court or jury may deem just.

DATED this 12th day of October, 2022.

/s/ Sean McDowell
Sean McDowell
Nevada Bar #15962
729 Evans Avenue Reno, Nevada 89521
(775) 786 5477
(775) 786 9658 – fax
sean@markmausertlaw.com

**INDEX OF EXHIBITS**

July 19, 2022 Issued Notice of Right to Sue………………………………………………..Exhibit 1